☑ Original          ☐ I

CLERK'S OFFICE
A TRUE COPY
Jun 23, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin



# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1653 Taylor Avenue, Racine, Wisconsin 53403 and the<br>person of Bradley Eugene ROGERS (DOB:  xx/xx/1972),<br>as more fully described on Attachments A-1 and A-2 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  **26-M-444 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1

**YOU ARE COMMANDED** to execute this warrant on or before ____7-7-26____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ____Honorable Stephen C. Dries____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:       6-23-26. 12:25 pm

*Judge's signature*

City and state:   Milwaukee, WI          Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

DESCRIPTION OF TARGET ADDRESS

The TARGET ADDRESS is 1653 Taylor Avenue, Racine, Wisconsin 53403. Public property records from the Racine County Register of Deeds website indicate the property appears to be zoned as a mixed-use building, with a retail space on the ground floor and a two-bedroom, one-bathroom apartment on the second floor; it is the second residence from the left on the second floor.





**DESCRIPTION OF PERSON TO BE SEARCHED**

BRADLEY EUGENE ROGERS ("ROGERS"), date of birth October 25, 1972, who is a white male with an approximate height of 5 foot 8 inches and approximate weight of approximately 205 pounds. A picture of ROGERS is shown below:



<u>**ATTACHMENT B-1**</u>
<u>**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**</u>


All records, documents, items, data, and other information that may constitute fruits or instrumentalities of, or contain evidence related to, violations of Title 18, United States Code, Section 2251(a) (sexual exploitation of children), Title 18, United States Code, Section 2252A(a)(2) (distribution and receipt of child pornography), and Title 18, United States Code, Section 2252A(a)(5)(B) (possession of child pornography), including, but not limited to, the following that may be found in the **TARGET ADDRESS**, as described in Attachments A-1 and A-2:

1.      Any and all cellular telephones with cameras and/or Internet capability, web cameras, cameras, film, videotapes, video recording devices, video recording players, or other photographic or video equipment that are reasonably believed to be owned, used or accessed by BRADLEY EUGENE ROGERS.


2.      Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, the crime(s) under investigation that are reasonably believed to be owned, used or accessed by BRADLEY EUGENE ROGERS.  The following definitions apply to the terms as set out in this attachment:

   a.  Computer hardware:  Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Hardware includes any data processing devices (including but not limited to central processing units, laptops, tablets, eReaders, notes, iPads, iPods, personal data assistants; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs; and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

   b.  Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

   c.  Documentation:  Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

3. Any and all images, videos, notes, documents, records, or correspondence pertaining to minors engaged in sexually explicit conduct.

4. Any and all records, documents, invoices, and materials that concern any online accounts including Facebook, Instagram, Skype, or any other account that allows chatting, e-mail, or video chats over the Internet, including screen names and e-mail addresses.

5. Any and all records, documents, invoices, and materials that concern any accounts with Internet Service Providers.

6. Any and all diaries, notebooks, notes, pictures, chats, directions, maps, banking, travel documents, and any other records reflecting personal contact and any other activities with minors.

7. Any and all documents, records, or correspondence pertaining to occupancy at 32 South Jefferson Street, 1A, Frederick, MD 21701.

8. Any and all notes, documents, records, or correspondence, including images or videos, that indicate a sexual interest in children or communications with children regarding sexual activity, including, but not limited to:
   a. Correspondence with children;

   b. Any and all visual depictions of minors;

   c. Internet browsing history;

   d. Books, logs, diaries, and other documents.

9.      Any and all records, documents, or correspondence relating to persuading, inducing, enticing, or coercing any minor to engage in any sexual activity in violation of the law.

10.      Any and all records, documents, or correspondence relating to transmitting obscene materials to minors.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials created, modified, or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

For any computer, computer hard drive, or other physical object upon which computer data can be recorded, which includes cellular phones, tablets, iPods, and other electronic devices (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.   evidence of the times the COMPUTER was used;

g.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

i. contextual information necessary to understand the evidence described in this attachment.

11. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software, or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

12. If after performing these procedures, the directories, files, or storage areas do not reveal evidence of child pornography or other criminal activity, the further search of that particular directory, file, or storage area shall cease.

13. With respect to the search of the information seized pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the

attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the Court. The investigative team may continue to review any information not segregated as potentially privilege.

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Jun 23, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1653 Taylor Avenue, Racine, Wisconsin 53403 and the<br>person of Bradley Eugene ROGERS (DOB: xx/xx/1972),<br>as more fully described on Attachments A-1 and A-2 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **26-M-444 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Sexual Exploitation of Children |
| 18 U.S.C. § 2252A(a)(2) | Distribution and receipt of child pornography |
| 18 U.S.C. § 2252(a)(5)(B) | Possession of child pornography |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

REGINA B SEWERYN  Digitally signed by REGINA B SEWERYN
Date: 2026.06.22 15:21:17 -04'00'

_____
*Applicant's signature*

Regina B. Seweryn, Special Agent - DSS
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 6-23-26
_____

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

I, Special Agent Regina B. Seweryn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent (SA) with the Diplomatic Security Service, United States Department of State ("DSS") and have worked for DSS since September 2021. I am presently assigned to DSS's Criminal Fraud Investigations ("CFI") Branch as a criminal investigator, where I specialize in investigations concerning human trafficking and other complex, multi-jurisdictional crimes. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

2. I have received specialized training in law enforcement and criminal law from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, DSS Basic Special Agent Course ("BSAC") in Blackstone, Virginia, and DSS Advanced Tactics, Leadership, and Skills Course ("ATLaS") in Blackstone, Virginia. Additionally, I am certified as a Sexual Assault Investigator by the Massachusetts Municipal Police Training Committee. I have conducted and participated in numerous investigations into various types of criminal violations, including sex and labor trafficking offenses, money laundering schemes, and identity frauds. In my assigned role, I frequently analyze evidence tied to commercial sex organizations and child sexual abuse material ("CSAM") on websites and databases. Throughout these investigations, I have reviewed CSAM across all forms of media. Through my training and experience, including on-the-job discussions with fellow law

enforcement agents and cooperating suspects, I am familiar with the operational techniques and organizational structures of CSAM distribution networks, as well as the traits and characteristics of child pornography collectors and possessors, and their use of computers and electronic devices to facilitate the collection, possession, trading, and distribution of child pornography. During my tenure with DSS, I have participated in numerous search and seizure operations, including the execution of premises search warrants, the search of suspects, and the seizure of electronic devices. Prior to joining DSS, I was a Special Agent with the National Security Agency since 2019.

3. I am currently investigating suspected foreign nationals who are selling CSAM and U.S.-based individuals who are purchasing CSAM. I make this affidavit in support of an application for a search warrant for the following:

a. The premises located at 1653 Taylor Avenue, Racine, Wisconsin 53403 (hereinafter the "TARGET ADDRESS"), and the electronic devices contained therein, further described in Attachment A-1. for evidence more specifically described in Attachment B; and

b. The person and electronic devices of BRADLEY EUGENE ROGERS ("ROGERS"), further described in Attachment A-2, for evidence described in Attachment B.

4. The facts and information contained in the affidavit are based upon my personal knowledge, and information, reports, and evidence obtained from state, local, and other federal law enforcement officers.

5. This affidavit contains information necessary to support probable cause for this search warrant application. It is not intended to include each and every fact and matter observed by me, other law enforcement officers, or known to the government. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that

2

statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

6. The evidence and information to be seized is described in Attachment B, and there is probable cause to believe that the TARGET ADDRESS and the person and electronic devices of ROGERS contain evidence, fruits, contraband, and instrumentalities of federal offenses related to violations of Title 18, United States Code, Section 2251(a) (sexual exploitation of children), Title 18, United States Code, Section 2252A(a)(2) (distribution and receipt of child pornography), and Title 18, United States Code, Section 2252A(a)(5)(B) (possession of child pornography) (hereinafter the "TARGET OFFENSES") committed by ROGERS between approximately January 1, 2024 and the present.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B:

a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph (in whatever form, e.g., digital and printed photographs),

3

film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Child sexual abuse material" or "CSAM," as used herein, has the same meaning as the term "child pornography," defined above.

e. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

f. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

g. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal

and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

h. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

i. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

5

j.  "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

k.  A provider of "Electronic Communication Service", as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications.  For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services.  See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

l.  The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.  The internet is a means or facility of interstate or foreign commerce.

m.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

n.  An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access

6

the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses.

o. A "link," "hyperlink," "Uniform resource locator," "URL," "URL link," or "web address" all refer to the location of a specific webpage on a computer network such as the internet. These locations are represented by a series of characters and symbols in a standard form that, when clicked, tapped, or inserted into a web browser, instructs the computer to fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet. From the perspective of a computer user, that user will be redirected another location or web page on the Internet or another network. URLs often take the form of "https://www.google.com" or "https://www.justice.gov." URLs can also specific a specific page or file within a larger website, such as "https://www.justice.gov/psc" or "https://www.fbi.gov/investigate/violent-crime/vcac."

p. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

q. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

7

r. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

s. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

t. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

u. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

v. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## STATEMENT OF PROBABLE CAUSE

8. In April 2025, DSS CFI received information from the Department of Justice and the Internal Revenue Service Criminal Investigations Division regarding a large network of India-

8

based PayPal accounts seemingly engaged in the sale of CSAM. DSS initiated an investigation to identify individuals selling and producing the material, who DSS is also concerned may be engaged in the sex trafficking of children abroad. During this investigation, DSS Special Agents identified numerous U.S.-based individuals who appeared to be purchasing CSAM from these India-based PayPal accounts. One such individual is BRADLEY EUGENE ROGERS. ROGERS PayPal account (PAYPAL ACCOUNT 1) uses his bradleyrogers1972@gmail.com and his number as 2623590241, although the PayPal account links to his previous address in Kenosha, Wisconsin, DSS knows through database checks and self-declared forms he currently resides in Racine, Wisconsin, at the TARGET ADDRESS.

**ROGERS' PayPal Transactions with India-based CSAM Accounts**

9. Subpoena returns from PayPal show one account in ROGERS' name that appears to transact with the target network in India. The following is ROGERS' account information as provided by PayPal:

Account #5345302215506251496 (hereafter "PAYPAL ACCOUNT 1")

Creation Date: June 3, 2024

First Name: Bradley

Last Name: Rogers

Email: bradleyrogers1972@gmail.com

Phone: 1 2623590241

Address: 2107 30th St, Kenosha, Wisconsin 53140

10. A review of ACCOUNT 1 reflects numerous seller accounts ("counterparties") identified by PayPal. Most of these counterparties appear to be based in India, the Dominican

9

Republic, and Costa Rica. ROGERS' transactions range from approximately $5 to $50 per transaction. PayPal generally sends transaction receipts to the email address registered with the account. Accordingly, ROGERS would have received PayPal transaction receipts at his registered email address: bradleyrogers1972@gmail.com. A review of his device history via PayPal shows he was registered with approximately five devices with device names all "Cancun," each are described as "moto g power 5G – 2024," and are either Android 14 or 15. The most recent device from the subpoena return is the Android 15, updated date of February 19, 2025. This suggests that ROGERS is in regular control of a smartphone; I know from my training and experience that individuals who have phones keep them on their person or in their residence.

11.     A review of the transactions associated with the account shows seven completed transactions where ROGERS appears to be purchasing CSAM. In total, there are approximately 14 completed purchases in ACCOUNT 1. The transactions in the account take place over a period from approximately June 2024 to February 2025. These purchases exhibit characteristics consistent with CSAM transactions, including: Payments made in whole-dollar amounts, a pattern commonly associated with CSAM sales; Transaction notes that were either absent or contained generic terms such as "Game" or "Food," consistent with efforts to disguise the true nature of the transactions; And references to Telegram, a messaging application that law enforcement has identified as a platform commonly used to facilitate communication between buyers and sellers of CSAM. Below is a chart showing SUBJECT's transactions with the India-based seller accounts.

| DATE/TIME OF PAYMENT | SELLER'S NAME | SELLER'S EMAIL ADDRESS | TRANSACTION AMOUNT |
|---|---|---|---|
| 21-Jul-2024 03:38:14 | SATPAL SINGH | maxxwell0369@gmail.com | $10.00 |

| | | | |
|---|---|---|---|
| 25-Jul-2024 23:48:00 | SATPAL SINGH | maxxwell0369@gmail.com | $10.00 |
| 26-Jul-2024 00:16:43 | SATPAL SINGH | maxxwell0369@gmail.com | $10.00 |
| 16-Jul-2024 00:42:21 | RAKESH KUMAR | sailentkiller343@gmail.com | $15.00 |
| 16-Jul-2024 00:10:51 | RAKESH KUMAR | sailentkiller343@gmail.com | $10.00 |
| 15-Jul-2024 00:31:20 | RAKESH KUMAR | sailentkiller343@gmail.com | $10.00 |
| 24-Jun-2024 22:56:52 | AJAY KUMAR | ajaykarwasraifazone@gmail.com | $5.00 |

12. Your affiant recognized account 1945532930310573016; email: ajaykarwasraifazone@gmail.com; INO: Ajay Kumar from a prior DSS investigation into this same target organization. In that investigation, subject D.M. was identified as having made payments to this account. Following a federal search warrant executed in January 2026, DSS SAs and local law enforcement conducted a Mirandized, recorded interview with D.M., during which he admitted to purchasing CSAM from this account and other Indian PayPal accounts associated with the target organization.

13. D.M. described the following process: he would identify individuals offering CSAM on social media platforms such as Snapchat, after which he would be directed to a Telegram channel to negotiate the purchase of and receive CSAM content. He admitted to receiving links containing CSAM from this target organization and paying for that content via PayPal. D.M. stated the material depicted pre-pubescent children and included incest and bestiality content, among other categories. D.M. stated he was both in communication with multiple Telegram and users directed to pay multiple PayPal accounts, but he believed them to be linked to the same

11

organization due to commonalities in the wording of the messages, which he described as "Indian." D.M. was arrested on local charges related to CSAM and his case remains ongoing.

### ROGERS' Prior Criminal History and Undeclared Social Media Accounts

14. On April 2, 2026, DSS criminal database queries returned an NCIC entry confirming ROGERS is a registered sex offender in Wisconsin. On August 14, 2015, ROGERS was convicted of Felony Child Enticement for acts involving oral and vaginal penetration of a female victim between the ages of 12 and 15. He was sentenced to nine years of imprisonment and released in January 2023. Upon release, ROGERS was registered as a sex offender on the Wisconsin Sex Offender Registry. His release included a period of extended supervision, from which he was discharged on July 16, 2025. ROGERS' sex offender registration obligation remains active and is scheduled to expire on July 16, 2040. The NCIC record lists ROGERS' email as bradleyrogers1972@gmail.com, identical to PAYPAL ACCOUNT 1's registration data. DSS personnel gathered additional criminal history details through database checks and consultation with the Wisconsin Sex Offender Registry Specialist.

15. Per ROGERS' most recent sex offender registration with the Wisconsin Department of Corrections dated January 6, 2023, ROGERS acknowledged the requirement to report any changes in email addresses and internet identifiers to WI DOC SOR within 10 days of the change. Throughout DSS's investigations, ROGERS appears to have violated Wisconsin Sex Offender Registry requirements by failing to disclose his social media accounts, including Facebook, TikTok, and Snapchat. I know from my training, experience, and discussions with other investigators that sex offenders who are required to disclose their online identifiers and choose not

12

to do so after being duly informed of said requirement may be engaged in criminal or prohibited activity using those accounts that they are seeking to conceal from law enforcement.

**CSAM Identified on ROGERS' Undeclared Facebook Account**

16. A subpoena return from Meta provided records for a Facebook account (hereinafter "FACEBOOK ACCOUNT"), registered under the name "Brian Casper" (Account No. 615777727628479; https://www.facebook.com/profile.php?id=615777727628479) opened on or about June 21, 2025, and active at the time of the subpoena. Two phone numbers associated with the FACEBOOK ACCOUNT directly link it to ROGERS:

    a. +1 (262) 359-0241 (verified June 21, 2025 at 22:02:31 UTC) — matches the phone number associated with ROGERS' PayPal account.

    b. +1 (262) 822-6238 (verified September 20, 2025 at 19:39:09 UTC) — matches the phone number listed in ROGERS' Wisconsin Department of Corrections Sex Offender Registry records dated April 1, 2026.

17. DSS SAs reviewed the profile picture of the FACEBOOK ACCOUNT, which depicts a brown or tan Chevrolet S-10 pickup truck parked in front of a building with unique windows, green brick trim, a security camera, and a 2-hour parking sign. A white work van and a white house are visible in the background. A Google Maps review of 1653 Taylor Avenue, Racine, WI 53403, the building associated with ROGERS' residence, shows an apparent entrance to that building along 17th Street. A Google Street View image from October 2024 shows the same landscape and building features as depicted in the profile picture of the Chevrolet truck. As such,

13

it appears ROGERS operates the FACEBOOK ACCOUNT. The FACEBOOK ACCOUNT is still active as of June 22, 2026.

18. DSS SAs reviewed the FACEBOOK ACCOUNT. While the account has only nine friends, it follows numerous other accounts and Facebook pages. Many of the followed pages are relevant to the area where ROGERS lives, including pages such as "Racine Busted," "Racine Campus - Wisconsin Humane Society," "Kenosha County Sheriff's Office," and "Kenosha Area Public Safety Incidents." However, many of the followed pages appeared to have no legitimate purpose and, based on DSS SA's training and experience, appeared to be accounts designed to look innocuous.

19. DSS SAs reviewed several accounts followed by the FACEBOOK ACCOUNT and noted they re-directed to child sexual abuse material (CSAM) or sexual content in general. A selection of the located material is summarized below. A screen recording of the FACEBOOK ACCOUNT and the videos described is maintained for record.

20. Summary of CSAM and Illicit Content Located:

    a. "Senpai Society" Account (1): The account contains innocuous animated images with the text "Video Link Under Comment." When links were clicked, users were redirected to an external video hosting site containing CSAM. One link contained an approximately one minute and fifteen second video of a prepubescent female, approximately 10 to 12 years of age, sitting and lying on a bed. She is dressed in a black bra, skirt, white boots, and a purple shirt. Her shirt is lifted to expose her bra, and an adult male pulls up her skirt to reveal her vagina, which he manipulates with

14

his fingers. The male, pictured only from the waist down, then inserts his erect penis into her vagina.

b. "Senpai Society" Account (2): Another video depicts two females, approximately 12–14 years of age, standing in front of a bunk bed. The females are clothed, then pull down their shorts and/or underwear and display their vaginas and anuses to a camera in a sexual manner. Neither female has pubic hair, and both have underdeveloped and thin limbs consistent with a child's growth.

c. "Senpai Society" Account (3): Another video from the same account shows a completely nude male child, approximately seven to eight years of age, receiving oral sex from an adult female. The child's penis is erect and he has no pubic or visible body hair. The child is small and the female is significantly larger. The female repositions the camera to reveal she is also fully nude and clearly adult, then inserts the child's penis into her vagina and begins to thrust. The video lasts 57 seconds.

d. "Arte Creativo" Page: This page consists of posts of crude drawings. Comments on the drawings contain links that redirect to videos. One post depicts three childlike females licking popsicles labeled "11," "12," and "13." A link in the comments redirects to a video of three females, all approximately 13 to 14 years of age based on facial features and small stature, appearing to be showering together nude. The link then redirects to a pop-up that prevents the video from playing in full, but the breasts of one of the girls are visible before that occurs.

15

e. "Reventado 2.0" Page: This page contains numerous posts of innocuous images and cartoons. One redirects to a channel on the encrypted messaging application Telegram called "Generación Goku" with 29,901 members. SA Niegelsky reviewed the Telegram channel, which contained cartoon images of children and video links. One link redirected to a one minute and nineteen second video depicting a prepubescent female, approximately nine to ten years of age, who is completely nude. The female is wearing a blue mask over her face, has no developed breasts or pubic hair, and her legs are being held up while she is being penetrated by an adult male's penis, as indicated by the male's developed genitals and size relative to the girl.

**Attempted Contact with a Minor via ROGERS' Undeclared TikTok Account**

21. On May 28, 2026, your affiant received notification from the Wisconsin Sex Offender Registry regarding a complaint submitted by ROGERS' ex-wife concerning his internet activity including the use of TikTok. The ex-wife reported that ROGERS used the online alias "malibusmost13," an apparent variation of the email addresses ROGERS provided to the sex offender registry: malibu0827@gmail.com and malibus0827@gmail.com, to contact her 16-year-old daughter through TikTok's direct messaging function. This alias bears no apparent connection to ROGERS' legal name. According to the ex-wife's report, ROGERS conducted this contact without disclosing his true identity.

**ROGERS' Undeclared Snapchat Account**

22. A review of ROGERS' Snapchat account records, current as of April 14, 2026, revealed the username b_rogers7179, registered to Bradley Rogers. The account was created on

July 18, 2025, and as of April 14, 2026, was last active on April 1, 2026. The account is associated with the email address bradleyrogers1972@gmail.com and phone number +1 (262) 359-0241. Records further reflect that ROGERS used the same email address and phone number to register his PayPal account.

23. In discussion with Wisconsen Sex Offender Registry, none of the above social media accounts were declared to them by ROGERS, as ROGERS is legally required to do. Your affiant knows that ROGERS is aware of the requirement that he declare all social media accounts because he has declared other online identifiers to include his email accounts.

24. In my training and experience, when an individual takes steps to conceal a social media account or email account from law enforcement – especially when that individual knows he is required to actively declare said accounts – that is indicative that the individual may be using those accounts for illicit purposes. Given ROGERS' status as a convicted sex offender and his use of Facebook it appears ROGERS may be knowingly concealing social media accounts for the purpose of obtaining CSAM.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN OR WHO DISTRIBUTE, RECEIVE, AND/OR POSSESS CHILD SEXUAL ABUSE MATERIAL

25. Based on my previous investigative experience related to child-exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who have a sexual interest in children and/or distribute, receive, or possess images of child sexual abuse material:

17

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in images, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including images and videos. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals frequently possess and maintain child sexual abuse material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children frequently retain those materials and child erotica for many years.

d. Likewise, such individuals often maintain their CSAM images in a digital or electronic format in a safe, secure and private environment, such as a personal computer or other digital devices. These CSAM images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the CSAM images, which are valued highly. Such individuals may specifically maintain devices containing or used to access CSAM in their personal vehicles so as to further conceal and hide those devices from others

18

within a shared household. Some of these individuals also have been found to download, view, and then delete CSAM on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

f. Such individuals also may correspond with and/or meet others to share information and materials, correspond with other CSAM distributors/possessors, conceal such correspondence as they do their sexually explicit material, and maintain contact information (e.g., online messaging accounts, etc.) of individuals with whom they have been in contact and who share the same interests in CSAM.

g. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period, and as such typically keep their child pornography – including child pornography in digital format – on them or in their residence. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

h. Even if the individual uses a portable device (such as a mobile phone) to access the Internet and CSAM, it is more likely than not that evidence of this access will be found in the TARGET ADDRESS as set forth in Attachment A-1 or on the person

19

as set forth in Attachment A-2, including on digital devices other than a portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

i. Based on all of the information contained herein, I believe that ROGERS, who resides at the TARGET ADDRESS, displays characteristics common to individuals who have a sexual interest in children and/or distribute, receive, or possess images of child pornography. In particular, ROGERS has a previous state conviction for Child Enticement, and appears to be presently engaged in repeated transactions with PayPal accounts linked to the advertising and distribution of CSAM. In my training and experience, if an online account is knowingly engaged in the sale or distribution of CSAM, it is highly unlikely that account is also being used for legitimate activities.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

26. As described above and in Attachment B, this application seeks permission to search for records that might be found at the TARGET ADDRESS, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27. Based on the foregoing, I submit that if a computer or storage medium is found at the TARGET ADDRESS, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

20

a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

21

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET ADDRESS because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish

22

and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information

23

indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, Internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

24

contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to obtain or access CSAM, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

30. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards,

25

memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search website all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

26

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

31. Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime— including, for example, serving as the instrument through which the perpetrator of the Internet-

27

based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

32. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrants and would authorize a later review of the media or information consistent with the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrants.

<b><u>BIOMETRIC ACCESS TO DEVICES</u></b>

33. This warrant permits law enforcement to compel ROGERS to unlock (1) any devices on ROGERS' person; and (2) any electronic devices reasonably believed to be owned, used or accessed by ROGER requiring biometric access. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition

28

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's

29

contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed above, I have reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint *and* the passcode or password has not been entered in a certain period of time.  Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours.  Other Android and Apple biometric features, and similar features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the

30

aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of ROGERS to the fingerprint scanner of the devices found at the TARGET ADDRESS; (2) hold the devices found at the TARGET ADDRESS in front of the face of ROGERS and activate the facial recognition feature; and/or (3) hold the devices found at the TARGET ADDRESS in front of the face of ROGERS and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that ROGERS state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel ROGERS to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **CONCLUSION**

34.     Based on the foregoing, I respectfully submit there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the TARGET ADDRESS and on the ROGERS' person, described in Attachments A-1 and A-2. I respectfully request that this Court issue the search warrants for the TARGET ADDRESS and ROGERS' person as described in Attachment A-1 and A-2, authorizing the seizure and search of the items described in Attachment B.

35.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain

31

a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the

Court, the return will not include evidence later examined by a forensic analyst.

32

<u>**ATTACHMENT A-1**</u>

**DESCRIPTION OF TARGET ADDRESS**

The TARGET ADDRESS is 1653 Taylor Avenue, Racine, Wisconsin 53403. Public property records from the Racine County Register of Deeds website indicate the property appears to be zoned as a mixed-use building, with a retail space on the ground floor and a two-bedroom, one-bathroom apartment on the second floor; it is the second residence from the left on the second floor.





# ATTACHMENT A-2

## DESCRIPTION OF PERSON TO BE SEARCHED

BRADLEY EUGENE ROGERS ("ROGERS"), date of birth October 25, 1972, who is a white male with an approximate height of 5 foot 8 inches and approximate weight of approximately 205 pounds. A picture of ROGERS is shown below:



## ATTACHMENT B-1
## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

All records, documents, items, data, and other information that may constitute fruits or instrumentalities of, or contain evidence related to, violations of Title 18, United States Code, Section 2251(a) (sexual exploitation of children), Title 18, United States Code, Section 2252A(a)(2) (distribution and receipt of child pornography), and Title 18, United States Code, Section 2252A(a)(5)(B) (possession of child pornography), including, but not limited to, the following that may be found in the **TARGET ADDRESS**, as described in Attachments A-1 and A-2:

1. Any and all cellular telephones with cameras and/or Internet capability, web cameras, cameras, film, videotapes, video recording devices, video recording players, or other photographic or video equipment that are reasonably believed to be owned, used or accessed by BRADLEY EUGENE ROGERS.

2. Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, the crime(s) under investigation that are reasonably believed to be owned, used or accessed by BRADLEY EUGENE ROGERS. The following definitions apply to the terms as set out in this attachment:

   a. Computer hardware: Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to central processing units, laptops, tablets, eReaders, notes, iPads, iPods, personal data assistants; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs; and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

   b. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

   c. Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

3. Any and all images, videos, notes, documents, records, or correspondence pertaining to minors engaged in sexually explicit conduct.

4. Any and all records, documents, invoices, and materials that concern any online accounts including Facebook, Instagram, Skype, or any other account that allows chatting, e-mail, or video chats over the Internet, including screen names and e-mail addresses.

5. Any and all records, documents, invoices, and materials that concern any accounts with Internet Service Providers.

6. Any and all diaries, notebooks, notes, pictures, chats, directions, maps, banking, travel documents, and any other records reflecting personal contact and any other activities with minors.

7. Any and all documents, records, or correspondence pertaining to occupancy at 32 South Jefferson Street, 1A, Frederick, MD 21701.

8. Any and all notes, documents, records, or correspondence, including images or videos, that indicate a sexual interest in children or communications with children regarding sexual activity, including, but not limited to:
   a. Correspondence with children;

   b. Any and all visual depictions of minors;

   c. Internet browsing history;

   d. Books, logs, diaries, and other documents.

9. Any and all records, documents, or correspondence relating to persuading, inducing, enticing, or coercing any minor to engage in any sexual activity in violation of the law.

10. Any and all records, documents, or correspondence relating to transmitting obscene materials to minors.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials created, modified, or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

For any computer, computer hard drive, or other physical object upon which computer data can be recorded, which includes cellular phones, tablets, iPods, and other electronic devices (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

     a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;

     b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c. evidence of the lack of such malicious software;

     d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

     e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

     f. evidence of the times the COMPUTER was used;

     g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

     h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

i. contextual information necessary to understand the evidence described in this attachment.

11. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software, or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

   a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

   b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

   c. "scanning" storage areas to discover and possible recover recently deleted files;

   d. "scanning" storage areas for deliberately hidden files; or

   e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

12. If after performing these procedures, the directories, files, or storage areas do not reveal evidence of child pornography or other criminal activity, the further search of that particular directory, file, or storage area shall cease.

13. With respect to the search of the information seized pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the

attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the Court.  The investigative team may continue to review any information not segregated as potentially privilege.